AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT
### for the
## Western District of Washington

| | | | |
|---|---|---|---|
| In the Matter of the Search of | ) | | |
| | ) | | |
| Information associated with one (1) Target | ) | Case No. | MJ20-149 |
| Accounts/Identifiers, for Investigation of 21 | ) | | |
| U.S.C. § 841 and Other Offenses | ) | | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I am a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in: the Western District of Washington, there is now concealed property and evidence described in Attachment B.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 841 | Distribution of Controlled Substances |
| 18 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 90 days (give exact ending date if more than 30 days: June 30, 2020) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Aaron McAuley, DEA TFO
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone/

Date: April 1, 2020

_____
*Judge's signature*

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

City and state: Seattle, Washington

USAO 2020R00143

1

2

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
## A SEARCH WARRANT AND PEN-TRAP ORDER

3    STATE OF WASHINGTON        )

4                               )        ss

5    COUNTY OF KING             )

6

7        I, Aaron McAuley, being first duly sworn, hereby depose and state as follows:

8                              **INTRODUCTION**

9        1.      I make this affidavit in support of an application for a search warrant under

10   Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information

11   about the location of the following cellular telephone:

12               a.      Target Telephone 3B (hereafter **TT3B**"): a cellular telephone

13   assigned call number **206-825-0829**, with service provider is T-Mobile, a wireless

14   telephone service provider headquartered at T-Mobile USA Inc, 4 Sylvan Way,

     Parsippany, NJ, 07054.  The Target Cell Phone is described herein and in Attachment A,

15   and the location information to be seized is described herein and in Attachment B.

16                                 ECPA

17       2.      The Court has jurisdiction to issue the proposed warrant under the

18   Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is

19   a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the

20   Court is in the Western District a district court of the United States that has jurisdiction

21   over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

22                            Pen Register Act

23       3.      Because this warrant seeks the prospective collection of information that

24   falls within the statutory definitions of information collected by a "pen register" and/or

25   "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed

26   to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

27       4.      The Court has jurisdiction to issue the requested pen-trap order because it is

28   a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court

is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

5.      This application includes all the information required by the Pen Register Act. *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Stephen Hobbs that (1) identifies DEA as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency.  18 U.S.C. § 3122(b).  The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

6.      A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

7.      In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers.  The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act.  Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

8.      The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-Mobile and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant

furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by the DEA pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

9.     **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

## AGENT BACKGROUND

10.     I am a commissioned law enforcement officer of the Seattle Police Department.  I am also assigned to the Drug Enforcement Administration (DEA), Seattle Field Office, as a Task Force Officer (TFO) with DEA Group D-22.  I have been employed by the Seattle Police Department as an Officer for over 13 years and a narcotics Detective for the last 4 years.  I have formal training in controlled substances investigations to include marijuana, methamphetamine, heroin, MDMA, oxycodone and cocaine.  My duty assignment includes investigating violations of federal and state controlled substance laws.  My law enforcement experience includes my participation in numerous investigations of organizations trafficking in controlled substances and as a result, I have an understanding of the manner in which drugs are distributed and the various roles played by individuals and groups in the distribution.  I have participated in the execution of over a 100 drug search warrants.

11.     Throughout the course of my training, and in my 12 years of law enforcement, I have become familiar with the methods of drug trafficking, have interviewed dozens of suspects and criminal informants, and others familiar with the drug trade.   I am familiar with the appearance, prices, and transport methods of illegal controlled substances.  I have testified in criminal proceedings in State courts relating to drug possession and trafficking.

Affidavit of TFO Aaron McAuley -3
USAO 2020R00143

12.     I am engaged in the investigation of narcotics trafficking with the assistance of federal and local law enforcement.  These entities include the Bureau of Alcohol, Tobacco and Firearms and Explosives (ATF), Homeland Security Investigations (HSI), Kent Police Department, Auburn Police Department, Renton police Department, Federal Way police Department and Washington State Patrol.

13.     I have written affidavits in support of court authorized federal warrants and orders in the Western District of Washington.  Additionally, I have testified in grand jury proceedings, written investigative reports, and conducted and participated in numerous interviews of drug traffickers of various roles within drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate.

14.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and pen-trap, and therefore does not set forth all of my knowledge about this matter.

15.     Based on the facts set forth in this affidavit, there is probable cause to believe that distribution of controlled substances, in violation of 21 U.S.C. § 841(a) (1), and conspiracy to commit that same offense in violation of 21 U.S.C. § 846, have been committed, are being committed, and  will be committed by Franklin LICONA or unknown persons.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

### PROBABLE CAUSE

16.     The United States, including the DEA, is conducting a criminal investigation of Franklin LICONA-RIVERA (hereafter "LICONA") and associates regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846.

17.     DEA Group D-22 has been investigating LICONA and his associates since September 2019.  During this time, DEA Group D-22 has made controlled purchases of methamphetamine from LICONA and controlled purchases of heroin that LICONA facilitated.  The most recent example of such a transaction is described below.

18.     In March 2020, I directed CS3[1] to meet LICONA at the barbershop where LICONA works with the intention of gaining LICONA's trust so CS3 could purchase cocaine from LICONA.

19.      On March 12, 2020, CS3 met with LICONA at the barbershop, LICONA was closing up the shop at the end of the day and gave CS3 a cell number of **206-825-0829** (**TT3B**) to call and make an appointment for a haircut.  This meeting was monitoring and recorded by DEA Group D-22.

20.     On March 14, 2020, CS3 called LICONA using 206-825-0829 (**TT3B**) and made an appointment.  CS3 went to the barbershop and during his appointment asked LICONA about possible cocaine sales.  LICONA told CS3 that he doesn't know about that but will get a number to CS3 that could possibly find some cocaine.  This meeting was not monitored, CS3 informed me of the conversation after it occurred.

21.     On March 20, 2020, CS3 called LICONA on 206-825-0829 (**TT3B**), and asked for the number he/she could use to purchase cocaine.  LICONA answered and asked CS3 how much they were looking for and for when. CS3 informed LICONA they would like a "sample" first and based on that they would order more.  CS3 informed me of this conversation and I advised them we would set up a controlled meeting in a few days.  Based on my training and experience, I know that a "sample" refers to a narcotics dealer giving a sample of a controlled substance to a customer to test for quality.

---

[1] CS3 has a felony conviction for narcotics and a gross misdemeanor conviction for DUI physical control.  CS3 is familiar with cocaine, its packaging, and how it is trafficked.  To my knowledge, CS3 has never given me false information and the information he/she has provided has proved to be true, some examples of which are outlined herein.  CS3 is working with law enforcement for monetary gain.  CS3 lives in this community and therefore, wishes to remain anonymous for fear of reprisals and retribution.

22.    On March 24, 2020, I directed CS3 to contact LICONA using 206-825-0829 (**TT3B**) to arrange a time to obtain the sample. CS3 informed me that LICONA was available to meet the following day.

23.    On March 25, 2020, DEA Group D-22, conducted a controlled meeting with LICONA using CS3. CS3 had a recording device on their person and this was being monitoring by DEA Group Supervisor Dan Olson. GS Olson is fluent in Spanish.

24.    At approximately 1:00PM, CS3 met with me and TFO Afalava at a pre-determined location. CS3 and their vehicle were searched for narcotics, paraphernalia and money, none were located. I checked CS3's cell phone and verified the number they were contacting LICONA on was 206-825-0829 (**TT3B**). CS3 called LICONA at this time and LICONA did not answer. At approximately 1:20PM, LICONA texted an address of 13602 Ambaum Blvd SW, which is a food market called La Canasta, and said he was about thirty minutes away.

25.    CS3 was followed to 13602 Ambaum Blvd SW, CS3 did not stop or contact anyone while in route. CS3 parked on the south side of the food market. GS Olson had CS3 under observation and we also had DEA helicopter with SA Parker as the spotter observing the meet.

26.    At approximately 2:06PM, CS3 called LICONA on 206-825-0829 (**TT3B**), LICONA informed CS3 he was ten minutes away. GS Olson monitored this call via the recording device.

27.    At approximately 2:23PM, GS Olson observed a red BMW sedan arrive and park close to CS3. SA Parker observed the driver of the red BMW exit the driver's seat and go to the trunk of the BMW and remove some kind of bag and return to the driver's seat. During this observation GS Olson could hear CS3 and LICONA describing each other's vehicles over the phone. GS Olson positively identified the driver of the red BMW as LICONA. GS Olson had observed previous narcotics deals with LICONA and is familiar with his appearance.

28.    SA Parker observed CS3 exit their vehicle and enter the rear seats of the red BMW. CS3 was in the red BMW for approximately one minute and SA Parker observed

CS3 return to their vehicle.  CS3 then drove to a pre-determined location to meet myself and TFO Afalava.  CS3 did not stop and contact anyone while in route to this location.

29.     As CS3 left the area, the red BMW left southbound.  TFO Linehan followed for a short distance and observed a Washington State license plate of BTS3430 on the red BMW (**TV3B**).   This vehicle is registered to a red 2001 BMW 330, to Brayan Herrera Hernandez at 608 S 152nd St, Apt E3, Burien, WA.

30.     SA Parker followed **TV3B** to a house located at 16840 Military Road S, SeaTac.  Surveillance was terminated at this time.

31.     Once at the pre-determined meeting location, CS3 relinquished a clear plastic wrapping containing a small white rock to me which, based on my training and experience, I recognized as cocaine.  I searched CS3 and their vehicle for narcotics, paraphernalia and money, none were located.

32.     CS3 informed me that the driver of **TV3B** was LICONA and the passenger was an unknown younger Hispanic male.  CS3 stated that once in the vehicle LICONA offered CS3 a sample of one pound of cocaine which he showed CS3.  CS3 told LICONA that they just want a small sample to try and then would discuss future deals. LICONA gave CS3 the plastic wrapper that was relinquished to me and gave CS3 the price of $32,000 for a kilo of cocaine. LICONA told CS3 that he doesn't want to sell smaller than a quarter of a kilo at a time.  CS3 took the sample and left.

33.     I took the sample to Tukwila Police Department, I field tested the sample and received a positive result for the presence of cocaine.  The sample weighed 0.6 grams without packaging.  The cocaine was packaged and placed into Tukwila evidence under TPD case number 2020-00969, item 28.

34.     Previously, during court-authorized GPS tracking of TV1, I observed the vehicle spending some nights at an apartment complex in Burien.  This apartment complex is called Windsor Court Apartments and is located at 219 S 156th Street, Burien, WA.  On March 26, 2020, I checked this apartment complex and located **TV3B** parked at the south end of the complex in public parking spaces.  The parking lot is open to the public and not secured.

Affidavit of TFO Aaron McAuley -7
USAO 2020R00143

## INFORMATION REGARDING CELL PHONES

35.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

36.    Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

37.    Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

38.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network.  When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication.  Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

39.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records).  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

40.     Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

41.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

42.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

43.     Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE, Timing Advance, and TruCall.   RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

44.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless

communication service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

45.     Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone.  These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone.  To provide for any such changes made to the Target Cell Phone, Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

### AUTHORIZATION REQUEST

46.     Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and  18 U.S.C. § 3123.

47.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber or user of the Target Cell Phone until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

48.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The agency shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

49.     Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on T-Mobile.  Because the warrant will be served on T-Mobile, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  I therefore request

1   that the Court authorize execution of the warrant at any time of day or night, owing to the

2   potential need to locate the Target Cell Phone outside of daytime hours.

3

4

5                                        Aaron McAuley, Affiant

                                         Task Force Officer

6                                       DEA

7

8        The above-named agent provided a sworn statement to the truth of the foregoing

9   affidavit by telephone on 1st day of April 2020]

10

11

12                                         BRIAN A. TSUCHIDA

                                       United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

DECLARATION

I, Stephen Hobbs, declare as follows:

1.      I am a duly appointed Assistant United States Attorney for the Western District of Washington, and I have primary responsibility for representing the interests of the United States herein.

2.      I make this declaration in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.  Pursuant to 18 U.S.C. § 3122(a)(1), I am the applicant for purposes of the pen-trap portion of the requested warrant and order.

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the DEA is the law enforcement agency conducting the investigation in this matter and that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by that agency.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Application is made on the basis of information officially furnished, and on that basis I verily believe such information to be true.

Executed this 1ˢᵗ day of April, 2020.

*s/ Stephen Hobbs*
Stephen Hobbs
Assistant United States Attorney

EXHIBIT 1 - Page 1
USAO 2020R00143

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone:

        a.      Target Telephone 3B (hereafter **TT3B**"): a cellular telephone assigned call number **206-825-0829**, with service provider is T-Mobile, a wireless telephone service provider headquartered at T-Mobile USA Inc, 4 Sylvan Way, Parsippany, NJ, 07054.  The subscriber/customer of the Target Cell Phone is unknown.

2.      The property to be searched includes:  (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

3.      In Attachment B, T-Mobile may be identified as the "Wireless Provider."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127.  As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Cell Phone. **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).**  Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below.  *See* 18 U.S.C. § 3103a(b)(2).

**I.     Section I:  Information to be Disclosed by T-Mobile**

1.     **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

a.     Names (including subscriber names, user names, and screen names);

b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.     Local and long distance telephone connection records 60 days prior to April 1, 2020.

d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions 60 days;

e.     Length of service (including start date) and types of service utilized;

f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

ATTACHMENT B – Page 1
USAO 2020R00143

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.     Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.     **Pen Register/ Trap and Trace Data and Associated Subscriber Records to Be Provided for a Period of [no more than 45 Days].**

a.     That T-Mobile shall install and monitor pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone including the date, time, and duration of the communication, and the following, without geographic limit and without notice to the subscriber:

(i)     IP addresses associated with the cell phone device or devices used to send or receive electronic communications;

(ii)     Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone number described in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

(iii)     IP addresses of any websites or other servers to which the cell phone device or devices connected; and

(iv)     Source and destination telephone numbers and email addresses.

b.     On a 24-hour-a-day basis, for the duration of the authorized pen-trap devices, T-Mobile shall provide the following records for those subscribers whose identifiers are obtained pursuant to the use of the pen-trap devices:  published or non-published subscriber names and addresses, including billing addresses.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.   **Historical Cell Cite Location Information.**

a.   All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from April 1, 2020, to date of execution of warrant including:

i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.   historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.  This information is to be provided irrespective of the application, name, or report utilized by the T-Mobile.  Accordingly, this information includes the following data sets to the extent that they are collected by the T-Mobile: RTT, PLU, PCMD, NELOS, EVDO, TruCall, ALULTE, and Timing Advance.

b.   The physical address and coverage maps of cell towers used by the Target Cell Phone.

1.   **Prospective Cell Site Location Information.**

a.   All information about the location of the Target Cell Phone described in Attachment A for **a period of 45 days**, during all times of day and night. This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.   The physical address and coverage maps of cell towers used by the Target Cell Phone.

2.   **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.   All information about the location of the Target Cell Phone

described in Attachment A for **a period of 45 days**, during all times of day and night. This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

      b.    The physical address and coverage maps of cell towers used by the Target Cell Phone.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-MObile is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

## II.    <u>Section</u> II:  Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Distribution of Controlled Substances, in violation of 21 U.S.C. § 841(a) (1), and/or conspiracy to commit that same offense in violation of 21 U.S.C. § 846 involving Franklin LICONA or his associates known or unknown.

1.    All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

2.    All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.    Location Information regarding the Target Cell Phone.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the T-Mobile in order to locate the things particularly described in this Warrant.

ATTACHMENT B – Page 5
USAO 2020R00143